# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **HARRIE REMBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Cause No. 1:15-cv-00387-SLC** |
| | ) | |
| **CITY OF FORT WAYNE,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |

## OPINION AND ORDER

Plaintiff Harrie Rembert ("Rembert") brings this action arising under 42 U.S.C. § 1983 and Indiana tort law against Defendants the City of Fort Wayne (the "City") and Fort Wayne Police Department (the "FWPD") officers Christopher Hoffman ("Hoffman"), Ryan Tosland ("Tosland"), and Stephen Jackson ("Jackson") (the FWPD officers together, the "Officers").[1] Rembert alleges that the Officers, acting within the scope of their employment for the City, are liable for the following: (1) violating his Fourth Amendment right against unreasonable search and seizure; (2) violating his Fourteenth Amendment right to equal protection of law; and (3) the state law torts of battery, false arrest, and false imprisonment. (DE 22 at 6-7 ¶¶ 34-39). Rembert also advances the state law claims against the City on a theory of *respondeat superior*. (DE 22 at 7 ¶ 40). Now before the Court is Defendants' motion for summary judgment (DE 26), which is fully briefed (DE 27; DE 28; DE 29), asserting that Defendants are entitled to judgment as a matter of law on all claims.

For the following reasons, Defendants' motion for summary judgment will be

---

[1] Subject matter jurisdiction arises under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting. (DE 11).

GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

Rembert contends that the Officers unlawfully searched and seized him because of his status as a homeless person during two encounters in the summer of 2015.  (DE 22 at 3 ¶ 14).  Hoffman was present at both encounters, Tosland was present at the first, and Jackson was present at the second.  (DE 26-1 ¶ 9; DE 28-2 at 12).

Hoffman started as a police officer with the FWPD on August 2, 2002.  (DE 26-1 ¶ 2).  It is not clear when Hoffman first met Rembert, but there is no dispute that they knew each other on some level and that Hoffman had detained or arrested Rembert several times prior to June 2015.  (DE 26-1 ¶ 5; DE 28-1 ¶ 5; DE 28-2 at 6-7; DE 28-3 at 2-3).  For example, Hoffman knew that Rembert had a history of felony convictions, crack-cocaine use and dealing, resisting law enforcement, assaulting police officers, and being "in vehicles he was not supposed to be in." (DE 26-1 ¶ 5; DE 26-4 at 9; DE 28-2 at 6; DE 28-3 at 2-3).  Hoffman knew Rembert well enough to suspect that Rembert's hands exhibited marks that are typically caused by holding a pipe to smoke crack cocaine.  (DE 26-1 ¶ 14; DE 28-3 at 3).  Rembert claims that he told Hoffman he was homeless prior to the encounters.  (DE 28-1 ¶¶ 3-4).  Hoffman, however, claims that he was unaware of Rembert's living arrangements at the time of the encounters.  (DE 26-1 ¶ 6).  Tosland and Jackson, on the other hand, had no prior contact with Rembert.  (DE 26-4 at 7, 13).

The first encounter at issue occurred after 10:00 p.m. on or around June 17, 2015, near a popular crack-cocaine smokehouse located at 3715 Oliver Street in Fort Wayne, which is in a

---

[2] For summary judgment purposes, the facts are recited in the light most favorable to Rembert, the nonmoving party.  *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

high crime area.  (DE 26-1 ¶¶ 21-23; DE 26-2 ¶¶ 4-5; DE 26-4 at 6, 8; DE 28-1 ¶ 6; DE 28-2 at 19; DE 28-3 at 3-4).  While Hoffman was training Tosland on field patrol, they saw Rembert standing on a public sidewalk near the smokehouse.  (DE 26-1 ¶ 24; DE 26-2 ¶ 5).  The Officers were in full police uniforms, carrying holstered weapons, and patrolling in a fully marked police vehicle.  (DE 26-1 ¶ 20; DE 28-1 ¶ 10).  Upon seeing the police vehicle, Rembert claims that he made his way towards the smokehouse to avoid being harassed by the Officers.[3]  (DE 26-4 at 8). Hoffman claims that, based on his knowledge of Rembert's history and the high-crime nature of the area, he became concerned that Rembert had committed, or was about to commit, a crime. (DE 26-1 ¶ 25; DE 28-3 at 3; DE 28-4 at 1).  Hoffman and Tosland stopped the squad car in the middle of the street and ordered Rembert to stop.  (DE 26-4 at 6; DE 28-1 ¶ 9).  The Officers then exited the squad car and approached Rembert.  (DE 26-4 at 6).  Hoffman asked Rembert what he was doing, and Rembert failed to answer the question.  (DE 26-1 ¶ 26; DE 28-2 at 11-12, 19; DE 28-3 at 3).  Tosland performed a pat down of Rembert's "exterior for weapons" and, after a check, confirmed Rembert had no active warrants.  (DE 28-4 at 1).  Hoffman then ordered[4] Rembert to show the Officers his hands for the purpose of training Tosland on the appearance of crack-cocaine burn marks.  (DE 28-1 ¶ 12).  Rembert complied without resistance or argument.  (DE 26-2 ¶¶ 10-11; DE 28-2 at 13).  After Hoffman and Tosland looked at Rembert's hands, they advised Rembert to leave the area because they believed "Rembert's

---

[3] Rembert, an admitted crack-cocaine user, claims that he did not intend to use any drugs inside the smokehouse and that he was not under the influence of any substance at the time of the first encounter.  (DE 26-4 at 8).

[4] The Court notes that Rembert describes this as something he was "asked" to do in his deposition (DE 26-4 at 17), but "ordered" to do in his affidavit (DE 28-1 ¶ 12).  The difference between being "ordered" and "asked" is germane to the Court's analysis of whether Rembert was seized for the purposes of the Fourth Amendment. However, in granting all reasonable inferences in favor of the non-moving party, the Court accepts that Hoffman "ordered" Rembert to display his hands.  *See Payne*, 337 F.3d at 770.

intentions weren't good[,]" and the Officers then departed in their police vehicle.  (DE 28 at 19; DE 26-4 at 9).  The entire encounter lasted "about five minutes."  (DE 26-4 at 10).  Neither Hoffman nor Tosland told Rembert that he was free to leave during this encounter.  (DE 28-1 ¶ 13).  In Rembert's affidavit, he stated that he believes he was not free to leave during this encounter and that he would have been arrested had he not complied.  (DE 28-1 ¶¶ 13-14).

Approximately a month later, the second encounter occurred around the corner of a gas station on the southwest corner of Pontiac Street and Clinton Street.  (DE 26-4 at 11-12; DE 28-1 ¶ 17).  The encounter took place after dark and in the rain.  (DE 28-1 ¶ 19; DE 28-2 at 8).  The owners of that gas station had authorized the FWPD to enforce a no-loitering policy because the gas station was a popular area to deal drugs and because cars were frequently stolen while customers went inside to pay for gas.  (DE 26-1 ¶ 8; DE 28-2 at 8-9, 16).  Hoffman was training and on patrol with Jackson, both in uniform, and riding in a marked police vehicle.  (DE 26-1 ¶ 12; DE 28-3 ¶¶ 3-5).  Rembert was standing around the corner of the gas station, out of sight of anyone entering or exiting the building.  (DE 26-1 ¶ 10; DE 26-4 at 11).  Rembert claims that he was standing there trying to get cigarettes from customers or to have customers buy cigarettes for him.  (DE 26-4 at 11).

Hoffman claims that when he saw Rembert standing far from the entrance, with no apparent purpose, and knowing Rembert's criminal history, he became suspicious that a crime was about to be committed, such as Rembert dealing drugs or Rembert taking somebody's car while that person paid for gas.  (DE 26-1 ¶ 11; DE 28-2 at 16; DE 28-3 at 3).  Hoffman asked Jackson "if [Jackson] had ever seen crack burns on someone's hands.  [Jackson] advised that [he] had not."  (DE 28-5 at 1).  Hoffman and Jackson then approached Rembert in the police

vehicle and "circled around [Rembert] a number of times[.]" (DE 28-1 ¶ 20). The police car then pulled up so that Hoffman's driver-side window was right by Rembert (DE 26-4 at 13), but the Officers stayed in the vehicle throughout the encounter. (DE 26-3 ¶ 6; DE 26-4 at 14). Hoffman asked Rembert what he was doing at the gas station and Rembert had no answer, which Hoffman found suspicious. (DE 26-1 ¶ 13; DE 28-3 at 3). Next, Hoffman ordered Rembert to come over to the police car window, "put [his] hands inside the police car through the window," and the two officers "touched and looked at [Rembert's hands]." (DE 28-1 ¶ 21; DE 26-4 at 12). Rembert did not argue or resist Hoffman's order.[5] (DE 26-1 ¶ 16; DE 28-2 at 17; DE 28-3 at 5; DE 28-5 at 2). Rembert then told Hoffman that he wanted to stop standing in the rain, and Hoffman responded, "Okay." (DE 26-4 at 12). Hoffman reminded Rembert that the gas station had a no-loitering policy and that Rembert "needed to move on."[6] (DE 26-1 ¶ 16; DE 28-3 at 3). The encounter lasted about three or four minutes. (DE 26-4 at 13). During this encounter, similar to the encounter on Oliver Street, the Officers did not tell Rembert that he was free to leave (DE 28-1 ¶ 23), and Rembert stated in his affidavit that he believes he was not free to leave (DE 28-1 ¶¶ 23-24). None of the Officers filed a report or arrested Rembert[7] (DE 26-1 ¶ 31), and Rembert suffered no physical injuries as a result of either encounter. (DE 26-4 at 15).

---

[5] In his deposition, Rembert denies that he was searched during this encounter. (DE 26-4 at 16).

[6] Rembert has been banned from or trespassed on other businesses in Fort Wayne. (DE 26-4 at 15; DE 28-2 at 9).

[7] The official FWPD policy regarding "Arrest, Search, Seizure" under the title "PD97-2301" establishes procedures for the FWPD when conducting different types of searches or seizures. (DE 28-6 at 7-9). Notably, if an officer conducts a search by consent of an individual, then that officer is to note doing so in a written report. (DE 28-6 at 8-9). If an officer has "articulable reasons to fear for his/her safety because he/she believes [the] individual to be armed and/or dangerous," then the officer is permitted to conduct a "Stop and Frisk" on the individual. (DE 28-6 at 9). However, the officer need not make a written record of a stop and frisk unless the officer also handcuffs the individual. (DE 28-6 at 9).

On September 15, 2015, Rembert issued a Notice of Tort Claim to Defendants. (DE 1-1; DE 22-1). On December 17, 2015, Rembert filed this case against Defendants. (DE 1; DE 22).

## II. STANDARD OF REVIEW

Summary judgment may be granted only if there are no disputed genuine issues of material fact. *Payne*, 337 F.3d at 770. "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Id.* (citations omitted). The Court is tasked only with deciding whether "there is any material dispute of fact that requires a trial" within the "evidence of record[.]" *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citations omitted). "[I]f the evidence is such that a reasonable factfinder could return a verdict in favor of the nonmoving party[,]" then summary judgment may not be granted. *Payne*, 337 F.3d at 770. A court must construe the record in the light most favorable to the nonmoving party and avoid "the temptation to decide which party's version of the facts is more likely true[,]" as "summary judgment cannot be used to resolve swearing contests between litigants." *Id.* (citations omitted). However, "a party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Id.* at 771 (citation omitted).

## III. DISCUSSION

As discussed below, Rembert alleges three claims for damages, declaratory relief, and injunctive relief against Defendants arising from the two encounters in the summer of 2015. First, he alleges that the Officers violated his Fourth Amendment right against unreasonable search and seizure. (DE 22 at 6 ¶¶ 34-35). Second, Rembert claims that the Officers violated his Fourteenth Amendment right to equal protection by targeting him for unlawful search and

seizure because he was homeless.  (DE 22 at 6-7 ¶¶ 36-37).  Third, Rembert alleges that the

Officers are liable for violations of Indiana tort law:  battery, false arrest, and false

imprisonment.  (DE 22 at 7 ¶¶ 38-40).  Rembert asserts that the City is liable for the state-law

tort claims under the doctrine of *respondeat superior* because the Officers acted within the scope

of their employment for the City during both encounters.  (DE 22 at 7 ¶ 40).  The Officers assert

the affirmative defense of qualified immunity to Rembert's constitutional claims.  (DE 24 at 12 ¶

10).

As a preliminary matter regarding Rembert's § 1983 claims, he "must show two

elements:  (1) the party against whom the claim is brought qualifies as a 'person acting under the

color of state law'; and (2) the conduct alleged amounted to a deprivation of rights, privileges, or

immunities under the Constitution or the laws of the United States."  *Tom Beu Xiong v. Fischer*,

787 F.3d 389, 397 (7th Cir. 2015) (citations omitted).  There appears to be no dispute regarding

the first element—that is, that the Officers were acting under color of state law during both

encounters in question.  Therefore, the Court's analysis only addresses the second element of

Rembert's § 1983 claims.

### A.  The Officers Will Be Granted Summary Judgment as to Rembert's Fourth Amendment Claims

The Fourth Amendment protects individuals against unreasonable search and seizure.

U.S. Const. amend. IV.  Two categories of seizure implicate the Fourth Amendment:  an arrest

and an investigatory stop.  *United States v. Parker*, No. 3:09-CR-148 JD, 2010 WL 2943649, at

*2 (N.D. Ind. July 21, 2010) (quoting *United States v. Mancillas*, 183 F.3d 682, 695 (7th Cir.

1999)).  Not every interaction between police officers and citizens fall into one of these

categories—a citizen might consent to an interaction with an officer and answer questions

without a Fourth Amendment violation. *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) ("[W]e have held repeatedly that mere police questioning does not constitute a seizure." (citing *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion)))*; United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008) ("A consensual encounter between an officer and a private citizen does not trigger the Fourth Amendment."); *United States v. Hendricks*, 319 F.3d 993, 999-1000 (7th Cir. 2003) (explaining that where a driver stops his car on his own and the police officers question him without coercive activity, the result is a consensual encounter). Accordingly, the Court's Fourth Amendment analysis will proceed by resolving two issues: (1) whether Rembert was seized for purposes of the Fourth Amendment, and if so, (2) whether the Officers seized Rembert based on reasonable suspicion of criminal activity.

"The proper inquiry" in determining whether law enforcement officers seize an individual "'is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter.'" *United States v. Drayton*, 536 U.S. 194, 202 (2002) (quoting *Bostick*, 501 U.S. at 436); *see United States v. Radford*, 856 F.3d 1147, 1149 (7th Cir. 2017) ("[A] seizure hasn't taken place so long as a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." (citations and internal quotation marks omitted)). Whether a reasonable person would feel free to terminate an encounter with a police officer is dependant on the totality of the circumstances. *Bostick*, 501 U.S. at 439; *United States v. Nobles*, 69 F.3d 172, 180 (7th Cir. 1995) ("The question of whether a particular encounter is voluntary is a factual one, dependant on the circumstances of each case." (citations and internal quotation marks omitted)). The circumstances the Court considers are:

> (1) whether the encounter occurred in a public place; (2) whether
> the suspect consented to speak with the officers; (3) whether the

> officers informed the individual that he was not under arrest and
> was free to leave; (4) whether the individuals were moved to
> another area; (5) whether there was a threatening presence of
> several officers and a display of weapons or physical force; (6)
> whether the officers deprived the defendant of documents [he]
> needed to continue on [his] way; and (7) whether the officers' tone
> of voice was such that their requests would likely be obeyed.

*United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015); *see Clements*, 522 F.3d at 794 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *United States v. Scheets*, 188 F.3d 829, 836-37 (7th Cir. 1999)).  "A consensual encounter, which involves no restraint on a subject's liberty and is characterized by non-coercive police questions of a citizen in a public place[,]" does not require any degree of justification or suspicion of criminal activity.  *Parker*, 2010 WL 2943649, at *2 (citations and internal quotation marks omitted); *see United States v. Burton*, 441 F.3d 509, 511 (7th Cir. 2006) (observing that an officer may approach a person on the street and ask him questions, which causes him to stop, listen, and answer with only a slight "curtailment of the bystander's mobility, privacy and peace of mind" so that no Fourth Amendment justification is needed); *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990) ("[T]he degree of suspicion that is required is zero." (citations and internal quotation marks omitted)).

If a reasonable person would not feel free to leave, the Court then considers whether the investigatory stop was justified under *Terry v. Ohio*, 392 U.S. 1 (1968).  Law enforcement officers "may conduct 'a brief investigatory stop when the officer has reasonable suspicion that criminal activity is afoot.'"  *United States v. Maclin*, 313 F. App'x 886, 888 (7th Cir. 2009) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), citing *Terry*, 392 U.S. at 30); *see Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010) (quoting *United States v. Hampton*, 585 F.3d 1033,

1038 (7th Cir. 2009)).  "Reasonable suspicion is less than probable cause but more than a

hunch."  *Maclin*, 313 F. App'x at 888 (citing *United States v. Lawshea*, 461 F.3d 857, 859 (7th

Cir. 2006)).  The reasonable suspicion determination is based on:

> the totality of the circumstances known to the officer at the time of
> the stop, including the experience of the officer and the behavior
> and characteristics of the suspect. . . .  Further, we recognize that
> certain behavior in isolation may have an innocent explanation yet
> that same behavior may give rise to reasonable suspicion when
> viewed in the context of other factors at play.

*Lawshea*, 461 F.3d at 859 (citations omitted).  The officer need not have reasonable articulable

suspicion when the encounter started, so long as it came into play before the seizure was made.

*United States v. Mays*, 819 F.3d 951, 957-58 (7th Cir. 2016).  For an encounter to "remain a

valid *Terry* stop, the stop must be 'limited in scope and execution through the least restrictive

means reasonable.'"  *Gentry*, 597 F.3d at 845 (quoting *United States v. Grogg*, 534 F.3d 807,

810 (7th Cir. 2008)).

1.  <u>A Reasonable Jury Could Find That the Officers Seized Rembert During the Oliver Street
Encounter</u>

The Officers argue that the Oliver Street encounter was consensual and did not trigger

Fourth Amendment concerns.  They claim that they approached Rembert to simply speak with

him and ask him why he was there, and Rembert willingly complied.  While the Officers admit

they were armed, there is no dispute that their guns did not leave their holsters.  The Officers

also argue that they did not touch Rembert, stating that "perhaps" Tosland performed a pat down

of Rembert's "clothing."  (DE 29 at 4).

Rembert disagrees.  According to Rembert, the Officers' actions and words were

"degrading" and "menacing" such that their questions were, in fact, commands.  (DE 28 at 16-

17).  Rembert argues that a reasonable person would not have felt free to leave during this encounter for several reasons.  However, some of the facts do not support Rembert's contention.

First, Rembert makes much of the fact that the Officers carried pistols, but he does not claim they were ever brandished.  "That most law enforcement officers are armed is a fact well known to the public.  The presence of a holstered firearm thus is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  *Drayton*, 536 U.S. at 205.  Therefore, the mere fact that the Officers were armed does not affect the consensual nature of the encounter.

Second, Rembert claims he was not free to leave, in part, because he *believes* that was the case.  However, the Court's analysis is objective, and does not incorporate Rembert's subjective beliefs.  *See Carlson v. Bukovic*, 621 F.3d 610, 619 n.15 (7th Cir. 2010) ("The reasonable person-free to leave standard is an objective one, and both the officer's and the encountered individual's subjective beliefs during the encounter are not determinative as to whether a seizure occurred." (citation omitted)).  Consequently, Rembert's subjective beliefs are not determinative of the Court's analysis.

Third, Rembert claims that no person would have felt free to leave when approached by an officer that had arrested him on multiple previous occasions, as Hoffman did in this case.  However, Rembert does not provide a single case in support of that assertion.  In any event, the history between Rembert and Hoffman does not distinguish the Oliver Street encounter from a "law enforcement officer . . . merely approaching an individual on the street or in another public place, [and] asking him if he is willing to answer some questions[.]"  *Shields*, 789 F.3d at 744 (citations omitted).  "It is well established that a seizure does not occur merely because a police

officer approaches an individual and asks him or her questions." *United States v. Smith*, 794

F.3d 681, 684 (7th Cir. 2015) (citations omitted).

Nevertheless, the Court is satisfied that a reasonable jury could find Rembert was not free

to leave once he was ordered to stop.[8]  *See Drayton*, 536 U.S. at 202 (citation omitted); *Radford*,

856 F.3d at 1149.  "A seizure may transpire any time police conduct 'communicate[s] to the

reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement.'"

*Smith*, 794 F.3d, at 684 (alterations in original) (quoting *Michigan v. Cheternut*, 486 U.S. 567,

575 (1988)).  Here, the Officers ordered Rembert to stop, and all evidence in the record shows

that he complied.  In fact, Rembert was in the process of walking away from the Officers when

they ordered him to stop.  In other words, Rembert did not want to stop or interact with the

Officers, they made him do so.  *See Mays*, 819 F.3d at 956 ("'Even when somebody is

confronted with an obvious show of authority, he is not seized until his freedom of movement is

terminated by an application of physical force or by the suspect's submission to the asserted

authority.'" (quoting *United States v. $32,400.00, in U.S. Currency*, 82 F.3d 135, 138-39 (7th

Cir. 1996)); *see cf. United States v. Williams*, 285 F. App'x 284, 287 (7th Cir. 2008) ("[T]he key

point of *Clements* is that when the police walk up to someone who is either out on the street or

sitting in a car that was already stopped (in other words, the police had nothing to do with the

driver's decision to pull over and park), there is no seizure at all." (citing *Clements*, 522 F.3d at

794)).  Additionally, it is somewhat relevant that the Officers did not tell Rembert that he was

free to leave.  *See United States v. Adebayo*, 985 F.2d 1333, 1338 (7th Cir. 1993) (observing that

---

[8] The Court notes that even if Rembert was not seized when ordered to stop, he was certainly seized once Tosland frisked him.  *See Mays*, 819 F.3d at 956 ("[A] fleeing suspect—even one who is confronted with an obvious show of authority—is not seized until his freedom of movement is terminated by intentional application of physical force or by the suspect's submission to the asserted authority." (citation and internal quotation marks omitted)).

the defendant was told "that he was not under arrest and was free to leave" was relevant to determining whether a seizure occurred). Considering these facts, a reasonable jury could find that Rembert was seized during this encounter.[9]

2. The Officers Had Reasonable Suspicion Supported by Articulable Facts to Conduct a Brief Investigatory Stop During the Oliver Street Encounter

In this case, no reasonable factfinder could believe that the Officers lacked reasonable suspicion to perform a *Terry* stop. First, the Court notes that Hoffman's 13 years of experience as a police officer with the FWPD, as of the summer of 2015, is relevant to the determination of reasonable suspicion. (DE 26-1 ¶ 2); *see Parker,* 2010 WL 2943649, at *5 (considering the two officers' experience was relevant to finding reasonable suspicion).

Second, the Officers were permitted to suspect Rembert of criminal activity based on the time and location that they found him. There is no dispute that Rembert was near a popular crack-cocaine smokehouse located in high-crime area, after dark, with no apparent purpose. (DE 26-1 ¶¶ 21-23; DE 26-2 ¶¶ 4-5; DE 26-4 at 6, 8; DE 28-1 ¶ 6; DE 28-2 at 19; DE 28-3 at 3-4). Such "contextual considerations" are not conclusive by themselves, but may "give rise to reasonable suspicion." *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (collecting cases); *see Wardlow*, 528 U.S. at 124 ("But officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop

---

[9] Rembert also claims that the Officers, through ordering Rembert to show them his hands, questioned him on suspicion of felony narcotics offenses, which rendered the encounter non-consensual. Such questions cross "the line between consensual conversation and a seizure . . . when police convey to an individual that he or she is suspected of a crime." *Smith*, 794 F.3d at 681. However, because Rembert was seized prior to being questioned on the marks on his hands, the Court does not consider this event in its analysis of whether the encounter was consensual.

occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis." (citation omitted)); *Maclin,* 313 F. App'x at 889 ("But [the defendant]'s presence at the apartment complex in the middle of a very cold night, just after reports of vehicle break-ins, although maybe not conclusive, was certainly relevant to the reasonable suspicion calculation." (citations omitted)); *United States v. Baskin*, 401 F.3d 788, 793 (7th Cir. 2005) ("[I]t is highly relevant to the reasonable suspicion analysis that the approaching vehicle's acceleration occurred in such close proximity to a newly discovered methamphetamine lab in an otherwise remote county park at a time when most people are asleep.").[10]

Third, a law enforcement officer may take into account the characteristics of an individual for the purposes of reasonable suspicion.  *See Mays*, 819 F.3d at 955 ("When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including . . . the behavior and characteristics of the suspect." (citing *Lawshea*, 461 F.3d at 859)); *United States v. Lenior*, 318 F.3d 725, 729 (7th Cir. 2003) ("When determining whether reasonable suspicion exists, we examine the totality of the circumstances known to the police at the time of the stop, including the experience of the officers and the behavior and characteristics of the suspect." (citation omitted)).  Rembert does not dispute that his characteristics, which were known to Hoffman, included felony convictions, assaulting police officers, and using crack cocaine.

---

[10] The Court is mindful that it must be cautious in contemplating Rembert's presence in a high-crime area for the purposes of "reasonable suspicion" because it could raise "concerns of racial, ethnic, and socioeconomic profiling."  *Caruthers*, 458 F.3d at 467.  However, because Rembert himself admits that the house on Oliver Street was a known place to smoke crack cocaine (DE 26-4 at 6, 8), and because Hoffman knew that Rembert used crack cocaine (DE 26-1 ¶ 5; DE 26-4 at 9; DE 28-2 at 6; DE 28-3 at 2-3), the Court's concerns regarding contextual factors are alleviated.  *See Caruthers*, 458 F.3d at 468 ("Fortunately, these concerns are alleviated here because [the defendant] concedes that the area around the intersection of Lewis and Lafayette streets in Nashville is a 'high crime' area where officers expect nightly calls regarding robberies or shots fired.").

Fourth, Rembert admitted that he was trying to avoid the Officers. It is well established that law enforcement officers are permitted to develop reasonable suspicion from such "furtive moments." *Maclin*, 313 F. App'x at 889 (quoting *Caruthers*, 458 F.3d at 466); *see Wardlow*, 528 U.S. at 124-25 (finding that evasion is suggestive of wrongdoing).[11]

Although Rembert contends the Officers did not have reasonable suspicion to perform an investigatory stop, he does not deny any of the circumstances discussed *supra*. Instead, Rembert argues that the facts of this case could not create reasonable suspicion, absent additional circumstances.

Rembert appears to argue that in order to reasonably suspect him of criminal wrongdoing, the Officers needed to receive reports of criminal activity in the area or witness Rembert perpetrating a crime. However, Rembert does not cite any authority recognizing such a need. In fact, "behavior that is innocent in isolation may in a particular context give rise to a reasonable suspicion." *Maclin*, 313 F. App'x at 889 (citing *Lawshea*, 461 F.3d at 859); *see also Mays*, 819 F.3d at 957-58 (knowing that the defendant was not involved in criminal activity that drew the officer's attention); *Borys*, 766 F.2d at 311-12 (interacting with an individual was sufficient to create "[r]easonable suspicion supported [the] investigative stop"). The absence of reports or observations of criminal activity did not deprive the Officers of their reasonable suspicion.

Rembert also contends that the Officers were not permitted to perform a *Terry* frisk

---

[11] Rembert's failure to articulate why he was in the area when asked is another potential factor that could have added to the Officers' reasonable suspicion. (DE 26-1 ¶ 26; DE 28-2 at 11-12, 19; DE 28-3 at 3); *Wardlow*, 528 U.S. at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *Terry*, 392 U.S. at 23 (standing or pacing on a street corner "not waiting for anyone or anything" was considered relevant to the officers' reasonable suspicion). However, since this verbal exchange did not occur until after the seizure, the Court does not consider this factor in its analysis.

without articulable facts indicating that Rembert was armed and dangerous. However, Officers did not need to be certain that Rembert was armed to pat him down. *See Parker*, 2010 WL 2943649, at *5 ("The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." (citation and internal quotation marks omitted)). Moreover, the fact that Hoffman knew that Rembert had assaulted police officers in the past (DE 26-1 ¶ 5; DE 28-2 at 6; DE 28-3 at 2-3) was sufficient to create the requisite amount of suspicion that Rembert "posed a danger to the [officers] or others" to justify a *Terry* frisk. *Gentry*, 597 F.3d at 847 (collecting cases).

Because a *Terry* stop is only valid so long as the frisk is "limited in scope and execution through the least restrictive means reasonable," the Court now turns to whether the Officers violated Rembert's Fourth Amendment right after stopping him. *Gentry*, 597 F.3d at 845 (internal quotation marks omitted). First, this stop took around five minutes (DE 26-4 at 10), which is reasonably brief. *See Wardlow*, 528, U.S. at 123 (holding that a stop must be brief to be consistent with *Terry*, 392 U.S. at 30).

Second, the touchstone of whether a search, and to a lesser extent a *Terry* frisk, is reasonable turns on "whether the individual, by his conduct, has exhibited an actual expectation of privacy, and whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *Gentry*, 597 F.3d at 848 (internal quotation marks omitted, collecting cases). Here, no facts indicate that Rembert expressed an expectation of privacy in his hands. Rembert's hands were not covered, and Rembert took no action to keep the marks out of plain view. *See id*. (finding that police violated a man's reasonable expectation of privacy by

searching the contents of a wheelbarrow because some items were covered by a raincoat and others were not in plain view); *cf. Daryl H. v. Coler*, 801 F.2d 893, 899-900 (7th Cir. 1986) ("[T]he visual inspection conducted by government officials of those parts of the human body usually *covered by clothing* implicates fourth amendment concerns." (emphasis added)). That Hoffman intended to show Tosland the burn marks for the sake of training is not a practice the Court encourages, but "this Court is not empowered to forbid law enforcement practices simply because it considers them distasteful." *Bostick*, 501 U.S. at 439.

3. No Reasonable Jury Could Find That the Officers Seized Rembert During the Gas Station Encounter

The Court's next task is to evaluate the encounter at the gas station under the same analyses discussed *supra*.

Rembert has failed to present facts that dispute the Officers' contention that, during the gas station incident, a reasonable person would feel free to terminate the encounter. *See Drayton*, 536 U.S. at 202 (quoting *Bostick*, 501 U.S. at 436); *Nobles,* 69 F.3d at 180. Rembert repeats arguments for this encounter that he used for the encounter on Oliver Street—that is, he argues that the Officers were armed, that he believes he was not free to leave, and that Hoffman had arrested him in the past. As the Court addressed these arguments *supra*, they will not be discussed in the analysis of this encounter.

The first factor that establishes a reasonable person would feel free to leave is that the Officers remained inside their squad car throughout the encounter. A reasonable person would not likely believe he was seized while talking to police officers who were in their car in a public place, *see Drayton*, 536 U.S. at 195 (observing that while officers were standing on exits of a bus and asking to search individuals, "[h]ad this encounter occurred on the street, it doubtless would

be constitutional"); *Bostick*, 501 U.S. at 434 (noting that "no doubt that if this same encounter had taken place before Bostick boarded the bus or in the lobby of the bus terminal, it would not rise to the level of a seizure"); *Florida v. Rodriguez*, 460 U.S. 1, 4 (1984) (finding no seizure in a "public area of the airport"), with no exits blocked, *Clements*, 522 F.3d at 795 ("Other than illuminating their flashing lights for identification and safety purposes, the officers did nothing that could have made Clements feel that his freedom was restrained: . . . , they did not surround Clements's car with multiple squad cars or officers or otherwise prevent him from driving away."); *Hendricks*, 319 F.3d at 1001 ("Although Officer Swisher followed the car into the Mobile station and stopped approximately fifteen feet behind it, there was nothing in front of the car to block its exit from the gas station."); *United States v. Pavelski*, 789 F.2d 485, 488 (7th Cir. 1986) (finding that a suspect was not seized until a third police car arrived and he was "bounded on three sides by police patrol cars"); *cf. Smith*, 794 F.3d at 686 (finding that two police officers blocking the defendant's exit from an alley with their bikes was "sufficient to communicate to a reasonable person that he was not free to leave"). Moreover, from their squad car, it would be difficult for the Officers to impose a "limitation of [Rembert]'s movement such as physical touching, display of a weapon, or other coercive conduct . . . that [would] indicate[] cooperation is required." *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008) (citing *United States v. McCarthur*, 6 F.3d 1207, 1275-76 (7th Cir. 1993)).

The next factor in the free-to-leave analysis is that the Officers did not issue an order to Rembert that would impede his freedom of movement. "A seizure may transpire any time police conduct 'communicate[s] to the reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement.'" *Smith*, 794 F.3d at 686 (quoting *Chesternut*, 486 U.S. at

18

575) (alterations in original)); *see cf. Mays*, 819 F.3d at 956 (citation omitted). Although, the Officers did order Rembert to come to the window and show them his hands, which will be addressed further *infra*, this was not an order for Rembert to halt or cease any movements he already was making. *See Williams*, 285 F. App'x at 287 ("[T]he key point of Clements is that when the police walk up to someone who is either out on the street or sitting in a car that was already stopped (in other words, the police had nothing to do with the driver's decision to pull over and park), there is no seizure at all." (citations omitted)).

Rembert's arguments that this encounter was not consensual are not persuasive. Rembert appears to argue that the Officers exhibited coercive behavior by circling him a number times before pulling up to him. To the extent that this could have made Rembert anxious, courts have found more direct and confrontational moments insufficient to rob an encounter of its consensual nature. *See Drayton*, 536 U.S. at 205-06 (witnessing his compatriot getting arrested did not mean that the defendant was seized); *Clements*, 522 F.3d at 792 (finding that the defendant would feel free to leave despite flashing red and blue emergency lights on the police vehicle, and shining flashlights in the defendant's car); *Pavelski*, 789 F.2d at 488 (finding that the defendant was not seized despite one police car pulling up behind him and one next to him, and asking him questions). Consequently, the Officers' circling Rembert does not rebut the Officers' contention that the encounter was consensual.

Rembert also argues that he was not free to go because he was ordered to show his hands to the Officers. This argument fails for several reasons. As discussed *supra*, Rembert was in a public place and the Officers remained in their vehicle. This order did not require Rembert to move to a different place, and barely required him to move at all because Hoffman pulled up

19

right next to him.  Law enforcement officers may approach and ask questions of an individual that causes him to stop to listen and answer with only a slight "curtailment of the bystander's mobility, privacy and peace of mind" so that no Fourth Amendment justification is needed. *Burton*, 441 F.3d at 511; *see cf. William*s, 285 F. App'x at 287 ("[W]hen the police walk up to someone who is either out on the street or sitting in a car that was already stopped . . . , there is no seizure at all." (citation omitted)).  Moreover, this order was not accompanied by an act that would force Rembert into compliance such as the Officers turning on their emergency lights or shining a light onto Rembert.  *See Hendricks*, 319 F.3d at 1001 ("[The officer] did not activate his emergency lights when [the driver] pulled into the gas station, nor did he shine a light on the car."); *see cf. Mays*, 819 F.3d at 956 (citation omitted).  In any event, although the Officers did issue an order, they did not terminate "[Rembert's] freedom of movement," leaving a reasonable person feeling at liberty to refuse the order.  *Mays*, 819 F.3d at 956 (citation omitted).

Rembert contends that the Officers, by asking to see the marks on his hands, questioned him on felony drug offenses, such that a reasonable person would not feel free to walk away. While officers may pose questions to an individual without requiring Fourth Amendment justification, "the line between consensual conversation and a seizure is crossed when police convey to an individual that he or she is suspected of a crime."  *Smith*, 794 F.3d at 681; *see Borys*, 766 F.3d at 311 ("In these circumstances where Borys knew that the agents had positively identified him as a suspect, a reasonable person would not have felt at liberty to leave." (citation omitted)).  Here, the Officers did not tell Rembert they suspected him of committing any crime; rather, they simply told Rembert they wanted to see the marks on his hands "for training."  (DE 26-1 ¶ 22).  This sort of questioning or inspection would not communicate to a reasonable person

that he was a suspect of a criminal investigation, such that he would not feel free to leave.

Rembert argues that he was not free to leave because the Officers physically touched his hands. However, it is not the act of physical touching itself that is indicative of a seizure, but rather whether a police officer's touching or conduct "communicate[s] to the reasonable person an attempt to capture or otherwise intrude upon [his] freedom of movement." *Smith*, 794 at 686-87 (alterations in original) (citation and internal quotation marks omitted). Here, by touching Rembert's hands, the Officers did not intrude upon Rembert's ability to move; rather, they merely inspected his hands. Moreover, as discussed *infra*, the Officers' touching of Rembert's hands does not appear to be part of a type of *Terry* frisk, that would indicate an investigatory stop had taken place.

Finally, Rembert claims that the encounter could not have been consensual because the Officers failed to note the encounter in a written report as required for consensual searches under FWPD policy. (*See* DE 28-6 at 9). This argument fails because "the violation of police regulations or even state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." *Thompson v. City of Chi.*, 472 F.3d 444, 454 (7th Cir. 2006) (citation omitted).

#### 4. Any Reasonable Factfinder Would Find That the Officers Had Reasonable Suspicion to Perform an Investigative Stop During the Gas Station Encounter

Rembert's arguments that an investigative stop was not justified under *Terry* are unavailing. In the first place, many of the facts that conferred reasonable suspicion in the Oliver Street encounter were present during this encounter: (1) Hoffman had 13 years of experience as a police officer, (2) Hoffman's knowledge of Rembert's violent and criminal history, and (3) the Officers found Rembert in a high-crime area, known for dealing crack cocaine at night.

Additionally, Hoffman was particularly suspicious that criminal activity was afoot because Rembert was standing around the corner of the entrance, where he could not be seen, clearly not conducting business at the gas station. (DE 26-1 ¶ 10; DE 26-4 at 11). This fact alone, while not dispositive for reasonable suspicion purposes, provided sufficient reason for Hoffman to approach Rembert and enforce the no-loitering policy. (*See* DE 28-2 at 8-9).

Viewing this encounter as some type of *Terry* stop, the Officers did not perform a full *Terry* frisk, leaving Rembert's Fourth Amendment right intact. An investigatory stop is valid as long as it is limited in scope and conducted through the least restrictive means possible. *Gentry*, 597 F.3d at 845 (collecting cases). Here, there is no dispute that the gas station encounter lasted less than five minutes, which is reasonably brief. *See Wardlow*, 528 U.S. at 123 (citation omitted). Further Rembert does not contend that the Officers patted him down; rather, they inspected his hands. Similar to the Oliver Street encounter, Rembert's hands were not covered; they were in plain view. *See cf. Daryl H.*, 801 at 899-900. As Rembert stated in his deposition, he did not feel as though he was searched (DE 26-4 at 16), belying any argument that his expectation of privacy was violated. *Gentry*, 597 F.3d at 848. Therefore, the Officers' motion for summary judgment will be granted with regard to all of Rembert's Fourth Amendment claims.

### B. The Officers Will Be Granted Summary Judgment as to Rembert's Fourteenth Amendment Claims

"The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike." *Plyer v. Doe*, 457 U.S. 202, 216 (1982) (citation and internal quotation marks omitted); *see Lunini v. Grayeb*, 395 F.3d 761, 767-70 (7th Cir. 2005). A plaintiff advancing an equal protection claim bears the burden of demonstrating "that he suffered unequal

treatment—the essence of an equal protection violation is, after all, *discrimination* of some sort." *Lunini*, 395 F.3d at 767-70.

Typically, a plaintiff in an equal protection case complains that he belongs to a group that is suffering some sort of discrimination. *Ind. Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 712 (7th Cir. 2004). The plaintiff "must prove that the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose." *Chavez v. Ill. State Police*, 251 F.3d 612, 635-36 (7th Cir. 2001) (citations omitted). To prove the "discriminatory effect" component, a plaintiff must establish that he is a member of a protected class or "otherwise similarly situated to members of the unprotected class," and that he was treated differently from members of the unprotected class. *Id.* at 636; *see Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009) ("Often an equal protection violation occurs when [the government] draws distinctions among people based on a person's membership in a 'suspect' class. Suspect classes include race, alienage, and national origin." (citations omitted)). To prove that the defendant treated the plaintiff differently than those similarly situated in the unprotected class, the plaintiff may name individuals in the unprotected class or use statistics. *Chavez*, 251 F.3d at 636. "Another typical equal protection challenge is based on denial of a fundamental right. Fundamental rights include freedom of speech and religion." *Srail*, 588 F.3d at 943 (citations omitted).

"Homeless persons are not a suspect class, nor is sleeping out-of-doors a fundamental right." *Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir. 2000) (collecting cases); *see also Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1108-09 (E.D. Cal. 2012). "In the absence of deprivation of a fundamental right or the existence of a suspect class, the proper standard of

review is rational basis." *Srail*, 588 F.3d at 943; *see, e.g.*, *Saiger v. City of Chi.*, 37 F. Supp. 3d 979, 982 (N.D. Ill. 2014) (applying the rational basis test to plaintiff's claim that the city violated his right to equal protection by distinguishing between homeless and non-homeless sex offenders).  This requires the plaintiff to show that:  "(1) the defendant intentionally treated him differently from others similarly situated, (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest."  *Smith v. City of Chi.*, 457 F.3d 643, 650-51 (7th Cir. 2006) (citations omitted).  In an equal protection claim based on a "class of one," a plaintiff need not demonstrate the second element of an equal protection challenge.  *Srail*, 588 F.3d at 943.

Here, Rembert fails to provide evidence of any similarly-situated non-homeless persons that have been treated differently.  Rembert supports his claim that he was treated differently with three purported facts:  (1) that he was in fact homeless at the time of both encounters; (2) that Hoffman knew that Rembert was homeless; and (3) that he *believes* that the Officers would not have stopped and searched him if he were not homeless.  Both Rembert's homelessness and Hoffman's awareness of that fact, are, by themselves, insufficient to create an inference that the Officers initiated either encounter because Rembert was homeless.  Rembert's "speculation regarding the [O]fficers' motive cannot overcome the contrary evidence that" the Officers' initiated both encounters for legitimate reasons.  *Devbrow v. Gallegos*, 735 F.3d 584, 588 (7th Cir. 2013).

In fact, Rembert does not dispute the facts underlying the Officers' reasons for initiating either encounter.  Instead, Rembert argues that the Officers should provide evidence that they

"stopped and physically inspected anyone but a homeless individual for physical signs and evidence of substance abuse." (DE 28 at 19). This is incorrect. It is not the Officers' burden to prove that they treated Rembert the same as other similarly situated, non-homeless persons; rather, it is Rembert's burden to prove that the Officers treated him differently than other similarly situated, non-homeless persons. *Smith*, 457 F.3d at 650-51. Consequently, Rembert has failed to provide any facts demonstrating that the Officers "intentionally treated [Rembert] differently" because he was homeless. *Id*. Having found that Rembert has failed to present an issue of material fact as to the first element of rational-basis analysis, the Court does not need to reach the second and third elements. *See id.* Similarly, the Court need not reach any additional issues regarding Rembert's "class of one" assertion because Rembert has failed to demonstrate that he was treated differently than other similarly situated, non-homeless persons. Therefore, the Court will grant summary judgment in the Officers' favor on Rembert's Fourteenth Amendment claims as well.

### C. The Officers Will Be Granted Summary Judgment as to Their Qualified-Immunity Defense

The Officers assert that, even if they violated Rembert's Fourth and Fourteenth Amendment rights, qualified immunity shields them from liability. (DE 24 at 12 ¶ 10). "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Huff v. Reichert*, 744 F.3d 999, 1003-04 (7th Cir. 2014) (citations and internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when

they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The doctrine allows 'ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

There are "two key inquiries for qualified immunity assertions: (1) whether the facts, taken in the light most favorable to the plaintiffs, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Id.* (citing *Pearson*, 555 U.S. at 232; *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts "may decide these questions in whatever order is best suited to the case at hand." *Id.* (citing *Pearson*, 555 U.S. at 236).

Because "the purpose of qualified immunity is to protect officers from guessing about constitutional developments at their peril, the plaintiffs have the burden of showing that the constitutional right was clearly established." *Id.* (citing *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008)). A plaintiff can show that the constitutional right is clearly established "by showing that there is 'a clearly analogous case establishing a right to be free from the specific conduct at issue' or that 'the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights.'" *Id.* (quoting *Smith*, 242 F.3d at 742). If the issue of qualified immunity "cannot be disentangled from disputed facts, the issue cannot be resolved without a trial." *Id.* (citing *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996)).

As discussed *supra* in parts *III.A* and *III.B*, a reasonable jury could not find that the Officers violated Rembert's Fourth and Fourteenth Amendment rights on either encounter. Therefore, the first inquiry for a qualified immunity analysis is answered in the negative—that is,

the facts, taken in the light most favorable to Rembert, could not support a finding by a reasonable jury that the Officers violated Rembert's constitutional rights.  Regarding the second inquiry in a qualified immunity analysis as it pertains to Rembert's Fourteenth Amendment claims, Rembert does not argue that there is an analogous case establishing a constitutional right that the Officers violated.  Therefore, the Court will grant summary judgment to the Officers for their qualified-immunity defense to Rembert's Fourteenth Amendment claims, addressing the second element of a qualified-immunity analysis with regards to Rembert's Fourth Amendment claims below.

Even if Rembert had presented facts that could convince a jury that the Officers' conduct satisfies the first element of a qualified-immunity analysis as to his Fourth Amendment claims, Rembert fails to present a clearly analogous case or establish that the Officers' conduct was so "egregious that no reasonable person could have believed it would not violate clearly established rights." *Gonzalez*, 578 F.3d at 540 (citation and internal quotation marks omitted).  Rembert argues that *United States v. Tyler*, 512 F.3d 405 (7th Cir. 2008), serves as an analogous case that put the Officers on notice that their conduct would violate Rembert's Fourth Amendment right.

In *Tyler*, two police officers noticed the defendant walking on a public street in Hammond, Indiana, with an open beer bottle in his hand.  512 F.3d at 407.  The officers believed that it was a crime to walk in public with an open alcohol container, unaware that doing so was in fact not a crime.  *Id*. at 408.  The officers approached the defendant and told him that he was breaking the law by carrying the open beer bottle.  *Id*. at 407.  Then, one officer noticed a bulge underneath the defendant's pants around his belt and asked him what it was.  *Id*. at 408.  A struggle ensued, and the officers found the defendant in possession of crack and powder cocaine.

*Id.* The Seventh Circuit found that the defendant was seized when the officers told him that he was breaking the law because no reasonable person would feel free to leave at that point. *Id.* at 410-11. This seizure, however, violated the defendant's Fourth Amendment right because the officers lacked reasonable suspicion to conduct an investigatory stop as they had seized the defendant based entirely on a mistake of law. *Id.* at 411 ("[W]e have held that a mistake of law (as opposed to a mistake of fact) cannot justify an investigative detention." (citing *United States v. McDonald*, 453 F.3d 958, 962 (7th Cir. 2006)).

Rembert argues that this case is similar to *Tyler* in that he "was outside, was approached by two city officers, was accused of a crime, had a warrant check ran on his name, and gave the officers no articulable reason to suspect him of a crime." (DE 28 at 21). The Court disagrees; *Tyler* is not analogous to this case. The Seventh Circuit held in *Tyler* that officers violate the Fourth Amendment when they perform an investigative detention and their reasonable suspicion is entirely grounded in a mistake of law. 512 F.3d at 407. Here, Rembert does not assert that the Officers detained him based on a mistake of law; he argues, rather, that the circumstances of the encounters do not amount to reasonable suspicion.[12] Because *Tyler* is not an analogous case, the Officers will be granted summary judgment on their qualified-immunity defense.

### D. Defendants Will Be Granted Summary Judgment as to Rembert's State-Law Claims

Rembert alleges that the City is liable for the torts of Hoffman, Tosland, and Jackson under the doctrine of *respondeat superior*, specifically for claims of battery, false imprisonment,

---

[12] The Court agrees with Rembert that *Tyler* affirms that police officers may not seize a person on the street absent reasonable suspicion. However, *Tyler* does not establish that circumstances similar to those in this case—i.e., a police officer's experience and knowledge of an individual's criminal history, finding an individual in a high-crime area known for dealing drugs without a purpose, and the individual attempting to flee—fail to create reasonable suspicion.

and false arrest.  Under Indiana law, "[i]f an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery."  *Wilson v. Isaacs*, 929 N.E.2d 200, 203 (Ind. 2010).  "Therefore, to establish a battery claim against a police officer effectuating an investigatory stop or arrest, a plaintiff must show that the officer used 'unnecessary or excessive force.'"  *Campbell v. City of Indianapolis*, No. 1:10-CV-01079-JMS, 2011 WL 5088633, at *5 (S.D. Ind. Oct. 25, 2011) (quoting *Wilson*, 929 N.E.2d at 203).

Here, Rembert fails to allege any facts suggesting that the Officers used excessive force on either occasion.  The extent of physical contact alleged is that the Officers patted Rembert down during one encounter and touched his hands on another.  Rembert admits that the contact did not cause any physical injury during either encounter.  In other words, Rembert fails to allege "any amount of force," *Wheatley v. Hendricks Cty. Sheriff*, No. 1:11-CV-0046-TWP-DML, 2012 WL 1833942, at *7 (S.D. Ind. May 18, 2012) (citation and internal quotation marks omitted), such as a "shove, [or] push," *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir.1996), that could cause "mere bumps and bruises," which could give rise to a viable excessive force claim, *Wheatley*, 2012 WL 1833942, at *7.  Thus, even when viewing the facts in light most favorable to Rembert and affording him all reasonable inferences, no reasonable jury could conclude that the Officers used unnecessary or excessive force against him.  Therefore, the Officers will be granted summary judgment as to Rembert's battery claim.

Regarding Rembert's remaining state law claims, the Supreme Court of Indiana and the Seventh Circuit agree that "the terms 'false arrest' and 'false imprisonment' [are] interchangeabl[e] when a plaintiff's claim stems from detention by authorities without probable cause."  *Bentz v. City of Kendallville*, 577 F.3d 776, 780 (7th Cir. 2009) (citations omitted); *see*

*Row v. Holt*, 864 N.E.2d 1011, 1016 n.4 (Ind. 2007).  Under Indiana law, "[f]alse imprisonment

is the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty

without consent."  *Miller v. City of Anderson*, 777 N.E.2d 1100, 1104 (Ind. Ct. App. 2002)

(citation omitted); *see Bentz*, 577 F.3d at 779 (quoting *Earles v. Perkins*, 788 N.E.2d 1260, 1265

(Ind. Ct. App. 2003)).  "If a defendant has probable cause to arrest the plaintiff or reasonable

suspicion to make a *Terry* stop, or if the plaintiff cannot show an absence of probable cause or

reasonable suspicion, then the plaintiff's false imprisonment claim fails."  *Alexander v. Doe*, No.

IP 01-1674-C-K/T, 2003 WL 22244782, at *10 (S.D. Ind. Aug. 20, 2003) (citing *Miller*, 77

N.E.2d at 1104).  Having found, *supra*, that the Officers did have reasonable suspicion to

perform an investigatory stop of Rembert in both encounters, Rembert's false imprisonment

claim fails.

"A defendant may be liable for false arrest when he or she arrests the plaintiff in the

absence of probable cause to do so."  *Miller*, 777 N.E.2d at 1104 (citation omitted).  "Indiana

law defines an 'arrest' as 'the taking of a person into custody, that he may be held to answer for

a crime.'"  *Elliot v. Sheriff of Rush Cty.*, 686 F. Supp. 2d 840, 867 (S.D. Ind. 2010) (quoting Ind.

Code. § 35-33-1-5).  However, under Indiana law an "arrest" does not occur during an

investigatory stop.  *See* Ind. Code § 35-33-1-5; *Elliot*, 686 F. Supp. 2d at 867 ("An investigatory

stop does not constitute an arrest under the Indiana definition of arrest." (citing *James v. State*,

622 N.E.2d 1303, 1307 (Ind. Ct. App. 1993))).

Rembert does not argue that he was taken into custody, handcuffed, or arrested during

either encounter with the Officers.  Instead, Rembert argues that the Officers are liable for false

arrest because they "restricted [his] liberty and freedom of movement absent his consent without

legal cause or process." (DE 28 at 22). Without a doubt, an investigatory stop briefly restricts an individual's freedom of movement. *See Wardlow*, 528 U.S. at 126 (accepting that *Terry* presents the risk of "allowing such detentions"). However, because an investigatory stop does not rise to the level of an arrest, the Court will grant the Officers' motion for summary judgment on Rembert's claims of false imprisonment and false arrest under Indiana law.[13]

Having granted summary judgment to the Officers on Rembert's state-law tort claims, his claims against the City under the doctrine of *respondeat superior* also fail. *See Perry v. City of Fort Wayne*, No. 1:15 CV 397, 2017 WL 3131012, at *9 (N.D. Ind. July 21, 2017) ("Because the defendant officers are entitled to summary judgment on the state law tort claims, Perry's *respondeat superior* claim fails as well."); *Branham v. Celadon Trucking Servs., Inc.*, 744 N.E.2d 514, 525 n.2 (Ind. Ct. App. 2001) (finding that because "summary judgment should be granted on all counts against the individual defendants, [the court] need not decide" the issue of the employer's vicarious liability under *respondeat superior*). Consequently, summary judgment will be granted in favor of the City on all of Rembert's state-law claim as well.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (DE 26) is GRANTED, and Rembert's claims against Defendants are DISMISSED. The Clerk is DIRECTED to enter judgment in favor of Defendants and against Rembert.

---

[13] Rembert supports his claim that false arrest is detention without process by citing *Bianchi v. McQueen*, 818 F.3d 309 (7th Cir. 2016). However, the plaintiff's detention in *Bianchi* was an arrest pursuant to a warrant issued after a grand jury indictment. 818 F.3d at 321. Thus, *Bianchi* is not applicable to the facts of this case because Rembert does not allege that he was arrested. Rembert also asserts that, under *Conwell v. Beatty*, 667 N.E.2d 768 (Ind. Ct. App. 1996), the Officers are liable in tort because they arrested him without probable cause. However, again, the Officers did not arrest Rembert; they performed an investigatory stop, which requires reasonable suspicion, not probable cause. Consequently, Rembert fails to present any authority indicating that he was falsely arrested.

SO ORDERED.

Entered this 29th day of September 2017.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge